Filed 5/16/22  Shakib v. Namvar CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SAM SHAKIB et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>MOUSA NAMVAR et al.,<br><br>Defendants and Respondents. | B310928<br><br>(Los Angeles County<br>Super. Ct. No. BC676261) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Roxborough, Pomerance, Nye & Adreani, Drew E. Pomerance and Ryan Salsig for Plaintiffs and Appellants.

Reiter Dye & Brennan and Paul T. Dye for Defendant and Respondent.

———————————

# INTRODUCTION

Sam Shakib and Hooshang "Sean" Namvar were real estate development partners. Through various limited liability companies, they executed a contract to develop a residential project in Los Angeles. When the project went awry, two of the limited liability companies sued Shakib and a third limited liability company. Shakib filed a cross-complaint. Among other claims, Shakib alleged Namvar breached their oral agreement to personally and equally share certain project development costs that were not included in the written contract. Shakib asserted Namvar stopped contributing half of the costs after construction halted.

Shakib appeals the judgment entered against him following the trial court's order granting Namvar's motion for summary judgment or adjudication for Shakib's cause of action for breach of oral contract. The trial court held Shakib's breach of oral contract claim against Namvar was barred by the applicable two-year statute of limitations. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Shakib and Namvar Partner To Develop Raw Land into Residential Real Estate*

In September 2014, Namvar and Shakib, acting through their respective LLCs, White Water Funding, LLC and TVD, LLC, entered into an Operating Agreement to form Sullivan Equity Partners, LLC. Shakib, an experienced real estate developer, agreed to oversee the development of a 12-acre parcel of land in the Brentwood neighborhood of Los Angeles (the Project). The Project required substantial grading work and

subterranean excavation prior to the anticipated construction of two single-family homes.

Pursuant to the Operating Agreement TVD was the Managing Member, and White Water and Dgade of Delaware, LLC were the two common, non-managing, members for the Project. The Operating Agreement established TVD had the exclusive right and responsibility to manage, control and complete the grading phase of the Project. The agreement memorialized the members' initial capital contributions and allocated their future costs. Shakib executed a Guaranty, personally guaranteeing TVD's performance under the Operating Agreement. The Operating Agreement shielded TVD from liability to Sullivan or the other members for TVD's actions, except for a material breach or its "Bad Acts." The agreement defined "Bad Acts" as "a party's fraudulent, reckless, willful or intentional misconduct, gross negligence or for its dishonesty, bad faith, commission of any crime, misappropriation of funds or other intentional wrongful act or intentional wrongful omission."

Shakib alleges, notwithstanding the extensive written Operating Agreement, he and Namvar, as individuals, previously entered into a separate oral agreement in which they "agreed to share equally and personally any costs required to complete the Project that arose as a result of events not anticipated in the Operating Agreement, such as equipment failures, neighborhood intervention to delay or stop the Project, the failure or revocation of permits or government approvals, litigation of any lawsuit arising out of the Project, or cost overruns." Namvar denies the existence of any oral side agreement.

3

B. *The Project Goes Sideways*

Work began on the Project in September 2014. Almost immediately, there was trouble. An inspector from the California Regional Water Quality Control Board visited the Project in "the first couple days" and "shut it down," citing faulty and missing documentation. In early October 2014, the Water Board sent Shakib a Notice of Violation letter that identified numerous issues that needed to be addressed, including documentation that required revision. A few weeks later the Water Board sent Shakib a second letter that enumerated additional problems and stated further revisions were required "[i]n order to complete the project as currently proposed[.]" The Water Board ordered all further work on the Project stopped until the issues were corrected.

Around the same time, in contravention of the Project's tree removal permit from the City of Los Angeles, Sullivan's construction workers cut down three protected trees on the property, which resulted in quasi-judicial administrative hearings before the City's Bureau of Street Services in February 2016. In March 2016, the Bureau found the tree removal was willful and recommended the City revoke all the Project's permits and suspend the issuance of any new permits for five years. Sullivan appealed the decision to the City's Board of Public Works. Following a hearing on June 24, 2016, the Board voted to uphold the Bureau's determination that the tree cutting was willful, revoked all the Project's permits, and as a penalty, suspended the issuance of any new permits on the Project for the next five years.

On July 27 and 28, 2016, the parties engaged in a series of emails. The exchange begins with an email from Sullivan's attorney, Patrick Mitchell, to Namvar and Shakib. Mitchell stated, "I received a call today from David Coupe, the attorney for the [Water Board]. He said that they had received our recent letters, were taking them seriously and would respond within the next few weeks." Namvar replied, "Nxt [sic] few WKS might b [sic] too late, because our grading permit will expire[.]" In response, Shakib wrote to Namvar, "Sean we need [an] attorney now[.]" Namvar answered, copying Shakib's attorney, Saul Jaffe: "Then go get one, this is your doing and you need to fix it, I responded to [Jaffe's] email and he never responded. Please look at the bad act in the [Operating Agreement] and show me the section in the [Operating Agreement] that talks about us sharing the legal fees."

Jaffe responded and urged Namvar to "[c]arefully read the Operating Agreement[,]" asserting "[t]he determination of gross negligence must be made by court order . . . ." Jaffe asked Namvar to "reconsider your position." Jaffe continued, "Complicating matters, there are a number of project related items that also need to be addressed such as the water board authorizations." Namvar replied: "We can talk about the water board issues but that wasn't what revoked the permits. . . .when I found out that he cut the wrong tree, that was a big issue. . . . [Shakib] was responsible to keep my permits safe and sound and with is [sic] bad acts he has ruined everything I worked for all this time."

Jaffe wrote, "I'm sorry that you are taking the position that you are and would urge you to reconsider and review the Operating Agreement which requires a court determination as to

5

gross negligence." Namvar replied, "YOU DONT THINK THAT THE COURTS WILL FIND THAT [SHAKIB] HAS DONE BAD ACTS? . . . And you think I would have to share the costs of proving this with [Shakib]?" Jaffe responded, "[m]y reading of the Operating Agreement is that you are obligated to pay for half of the costs."

In his final email in this exchange Namvar stated, "But shouldn't [Shakib] be the one to pay for the fees to undo HIS mistake?" Namvar then lists his grievances against Shakib, concluding with "the way I c this is I can the spend the money and go after [Shakib]/envicom/and the water board and have a Better chance of getting damages, rather than going after the city?? I have not decided what I want to do, but this should be a notice to [Shakib] to fix the situation with his own money as he is supposed to under the operating agreement." Jaffe replied, "I renew the request for you to reconsider your position and if you chose not to change your position and to stand on grounds that are not consistent with the requirements and your obligations of the Operating Agreement, you are free to do so; however, such a position has the likelihood of significant adverse ramifications to your interest (and any other member taking a similar position). Failing to act when you have a responsibility and obligation under the Operating Agreement will have consequences."

On August 17, 2016, Namvar sent another email to Shakib and Jaffe stating: "I have given you notice that the bad acts have occurred per our agreement a while back which [Shakib] MUST cure his Bad Acts per the operating agreement. . . . I want to know what steps you are taking to cure these Bad ACTS. I have not commenced mediation, but my investment is in total risk and I want to make sure you are on top of this to protect our permits

and reinstate them as such. I wont [sic] have any choice but to follow the operating agreement and try to seek damages."

C. *The Lawsuit*

On September 19, 2017, White Water, Dgade and Sullivan sued Shakib and TVD for breach of the Operating Agreement, breach of fiduciary duty, breach of Shakib's personal guaranty and rescission. On October 22, 2018, Shakib and TVD filed the operative cross-complaint against Namvar, White Water and another of Namvar's LLCs (Trifish, LLC) for negligence and breach of oral contract. Shakib brought the breach of oral contract claim solely against Namvar, alleging "[i]nitially . . . [Namvar] paid his share of the expenses in accord with the parties' agreement" but then breached their oral contract "by failing to continue to contribute his half of the funds necessary to pay the expenses that the parties agreed they would share equally." Namvar, together with his LLCs, moved for summary judgment, or in the alternative, summary adjudication, on Shakib and TVD's cross-complaint. Namvar denied the existence of an oral contract and argued any breach of the purported oral agreement occurred back in July of 2016 when Namvar "repudiated" any such cost-sharing obligation in his string of emails to Shakib and Jaffe. The trial court granted the motion for summary judgment on the cross-complaint, finding that if the parties had an oral agreement, Namvar repudiated it in July 2016, and the applicable two-year statute of limitations barred Shakib's breach of oral contract claim.[1] The trial court entered

---

[1] Shakib did not appeal the trial court's grant of summary judgment/adjudication as to his first cause of action for negligence.

judgment in favor of Namvar and Trifish on January 19, 2021.[2] Shakib timely appealed.

## DISCUSSION

A. *Standard of Review*

"We review a grant of summary judgment de novo." (*Vasquez v. Department of Pesticide Regulation* (2021) 68 Cal.App.5th 672, 685; *Park Management Corp. v. In Defense of Animals* (2019) 36 Cal.App.5th 649, 658.) "'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; accord, *Wilkin v. Community Hospital of the Monterey Peninsula* (2021) 71 Cal.App.5th 806, 820.)

"A motion for summary judgment is properly granted if 'there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" (*Vasquez v. Department of Pesticide Regulation*, *supra*, 68 Cal.App.5th at p. 685, quoting Code Civ. Proc., § 437c, subd. (c).)

"'[A] defendant moving for summary judgment based on an affirmative defense "'bears an overall burden of persuasion that there is a complete defense to the plaintiff's action'" [and] must persuade the court there is no triable issue of fact as to that defense.'" (*Park Management Corp. v. In Defense of Animals*, *supra,* 36 Cal.App.5th at p. 658.) To meet this threshold burden, a defendant's showing "must be supported by evidence, such as affidavits, declarations, admissions, interrogatory answers,

---

[2] Disputes between TVD, Dgade, and White Water remain pending before the trial court.

depositions, and matters of which judicial notice may be taken." (*Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1078.) Once a defendant's initial burden on summary judgment is met, "the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense. . . . A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof." (*Ibid.*)

B. *The Statute of Limitations Bars Shakib's Cause of Action for Breach of Oral Contract*

The parties agree the outcome of this appeal primarily turns on the content of their July 2016 email exchange. Those emails are in the record and are undisputed, but the parties disagree regarding whether Namvar's emails constituted an unequivocal repudiation of their purported oral agreement and, if so, whether that repudiation triggered the two-year statute of limitations, rendering untimely Shakib's claim for breach of oral contract.

It is well-settled that "[a] statute of limitations 'does not begin to run until the cause of action accrues,' and a cause of action accrues at the moment when the party alleging injury is entitled to ""bring and prosecute an action thereon.""" (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 930-931.) "The statute of limitations is an affirmative defense, and as with any affirmative defense, the burden in on the defendant to prove all facts essential to each element of the defense." (*Id.* at p. 945.) While "[r]esolution of statute of limitations issues is ordinarily a question of fact," a defendant may still prevail on

9

summary judgment "if '"the uncontradicted facts established through discovery are susceptible of only one legitimate inference."'" (*State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1132, quoting *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 (*Romano*).)

The parties agree the statute of limitations for breach of an oral agreement is two years. (Code Civ. Proc. § 339 ["[a]n action upon a contract, obligation or liability not founded upon an instrument of writing" must be commenced "[w]ithin two years"]; *Cavalry SPV I, LLC v. Watkins* (2019) 36 Cal.App.5th 1070, 1081 ["In California, the statute of limitations is . . . only two years for a breach of contract claim based on an oral agreement"].)

As a general proposition, "[a] cause of action for breach of contract ordinarily accrues at the time of the breach, and the statute begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his or her right to sue." (3 Witkin, Cal. Procedure (6th ed. 2021) Actions § 567(1); see *Ram's Gate Winery, LLC v. Roche*, *supra*, 235 Cal.App.4th at p. 1084.) In order "to pinpoint the time of an alleged breach for purposes of the statute of limitations, it is necessary to establish what it was the defendant promised to do, or refrain from doing, and *when its conduct diverged* from that promise." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 958.)

"'California law recognizes that a contract may be breached by nonperformance, by repudiation, or a combination of the two.' [Citations.] 'Any breach, total or partial, that causes a measurable injury, gives the injured party a right to damages as compensation.' [Citations.] Nonperformance typically refers to an unjustified or unexcused failure to perform a material

10

contractual obligation when performance is due. [Citation.] But '[t]here can be no actual breach of a contract until the time specified therein for performance has arrived.' [Citation.] By contrast, 'an anticipatory breach of contract occurs when the contract is repudiated by the promisor before the promisor's performance under the contract is due.'" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 549-550.) The Supreme Court explained, "if a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred." (*Romano, supra,* 14 Cal.4th at p. 489; see *Guerriri v. Severini* (1958) 51 Cal.2d 12, 18 [a party "positively repudiates the contract by acts or statements indicating that he will not or cannot substantially perform essential terms thereof"].)

Here, the purported oral agreement required Shakib and Namvar to personally and equally share certain unanticipated costs not addressed in the written Operating Agreement between the parties' respective LLCs. These included costs from "the failure or revocation of permits or government approvals" and any litigation costs arising from the Project. The alleged oral agreement did not contain an express time for performance, but purportedly contemplated Shakib and Namvar would pay the unanticipated costs as they arose. According to Shakib, Namvar initially complied with the oral agreement and later refused. Namvar argues the undisputed facts and all accompanying reasonable inferences demonstrate that in July 2016, more than two years before Shakib filed his Cross-Complaint, Namvar clearly repudiated the alleged oral agreement.

11

1. *Namvar's July 2016 Emails Constituted an Immediate Breach of the Oral Contract*[3]

Shakib argues Namvar's July 2016 emails did not constitute a repudiation of the oral contract because the emails were not a "'clear, positive, unequivocal refusal to perform.'" (quoting *Taylor v. Johnston* (1975) 15 Cal.3d 130, 137). As support for this argument, Shakib notes Namvar only referred to the Operating Agreement in his July 2016 emails. Shakib suggests the emails demonstrate, at most, Namvar was refusing to pay the additional costs through his LLC under the Operating Agreement, and ostensibly it is reasonable for us to infer Namvar might have honored his obligation to pay these same costs personally, pursuant to their oral agreement. Alternatively, Shakib posits while Namvar was refusing to pay in July of 2016, Namvar had not unequivocally ruled out the possibility of reimbursing Shakib down the line. These inferences cannot reasonably be drawn from Namvar's words, particularly when read in the context of all the July 2016 emails from Namvar, Shakib and Jaffe.

Any reasonable finder-of-fact reading the increasingly heated July 2016 written exchange would be hard-pressed to infer anything from Namvar's emails other than his absolute, unwavering refusal to take responsibility, financial or otherwise, for the Project mishaps and the myriad costs and delays that

---

[3] Although we reference the oral contract alleged by Shakib, we are not making any findings as to whether such a contract existed or was breached. Rather, we consider the facts in the light most favorable to Shakib, as we must on appeal from a grant of summary judgment adverse to him. (See *Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168.)

12

followed. (See *Parker v. Walker* (1992) 5 Cal.App.4th 1173, 1190 [statute of limitations on oral contract began to run when defendant "refused to acknowledge" plaintiff's entitlement under the contract].) The costs that arose from the City's revocation of all the Project's permits and the accompanying litigation expenses fall squarely within the purported oral contract between Shakib and Namvar. Namvar's refusal to pay those costs constituted a breach of an essential term of the agreement; indeed, the entirety of the oral agreement, according to Shakib, was for Namvar and Shakib to personally share unanticipated costs that were not addressed in the Operating Agreement.

Namvar expressed his position clearly when he told Shakib and Jaffe, over the course of four emails in one day, that Shakib was the one responsible for the wrongful tree removal that caused the City to revoke the Project's permits. Namvar considered the unauthorized tree removal to be a "bad act" as defined by the Operating Agreement and asserted Shakib "should pay to fix" the permitting problems, declaring "this should be a notice to [Shakib] to fix the situation with his own money." Namvar reinforced his repeated refusals to share costs in his July 2016 emails with a follow-up email nearly a month later. Namvar reiterated his position that Shakib must cure his "bad acts" and again threatened Shakib with litigation if he failed to comply.

The fact that Namvar only referenced the Operating Agreement when he emphatically denied responsibility for the Project's peril and associated litigation costs does not create a reasonable inference that he was leaving the door open to personally pay those costs in the future. In addition, it would have made no sense for Namvar to reference the oral agreement

13

in his emails because Namvar claims no such oral agreement existed. Similarly, Shakib's assertion that Namvar might have later paid the unanticipated costs through White Water is not only an unreasonable inference from the emails, but it strains credulity given Shakib alleged in his Cross-Complaint that Namvar "was responsible for, and personally directed" White Water as a "shell entity" that he solely owned and controlled.

Shakib also maintains Namvar's statements were not unequivocal because Namvar wrote, "I have not decided what I want to do." Shakib contends Namvar's statement lends credence to the "equally reasonable" inference that Namvar was "still in the process of considering his options." Shakib's argument takes Namvar's statement out of context. Read in the totality of their email exchange, Namvar's statement refers to his indecision as to whom he ought to sue for damages, not whether he ought to share in the litigation costs to rectify the tree-cutting and Water Board issues.[4] In his prior sentence, Namvar states, "the way I c [sic] this I can spend the money and go after [Shakib]/envicom/and the water board and have a better chance of getting damages, rather than going after the city??" Namvar's clause, immediately after "I have not decided what I want to do," reads, "but this should be a notice to [Shakib] to fix the situation with his own money as he is supposed to under the operating

---

[4] Namvar writes: "as far as water board 3 things could happen [¶] A-We can go after water board because they charged me a lot of money and then pulled the permit [¶] B- Enviocom did something wrong and got us the permit based in their wrong calculations which I could go after them [¶] C- [Shakib] triggered the stoppage of the job by violating the permit [¶] IN EITHER CASE I AM NOT AT FUALT [sic] AND WILL AND CAN PROVE IT very easily[.]"

14

agreement." In these emails, Namvar also delineated his grievances against Shakib and his rationale for why Shakib alone should pay: "1- [Shakib] was responsible for the development of this project [¶] 2- [Shakib] was the one responsible to protect the trees and their cuttings [¶] 3- it happened during his watch and it was his responsibility to make sure it doesn't happen. [¶] 4- he should pay to fix this one issue since he was the one who caused it [¶] 5- if the permit is reinstated, then he can go fwd [sic] and developed [sic] this property [¶] 6- I had absolutely nothing to do with the cutting that tree that led to revoking the permit . . . [¶]13- the tree situation is more than clear and all the facts are undisputed." Nothing in Namvar's emails suggests lingering indecision regarding his potential future financial contribution to fix a "mistake" for which he believed Shakib was solely responsible. In July 2016 Namvar's only apparent uncertainty was regarding which party or entity he would "go after" for damages.

Shakib's attorney, Jaffe, recognized the lack of ambiguity in Namvar's refusal and repeatedly asked him to reconsider his position.[5] In addition, in his deposition testimony, Shakib confirmed that Namvar's refusal to share costs was unambiguous and unwavering. Shakib testified that "from some point [Namvar] said: I'm not going to pay a dime. And he walked away. I'm paying all the money now. And instead of he come help [sic] he hired you [Namvar's attorney] to beat me up." Shakib testified this exchange occurred when Namvar told Shakib, "'You cut the trees. Your fault, you got to pay.'" This aligns with the content of Namvar's July 2016 emails, sent a few

---

[5] All of Namvar's emails, including his follow-up in August 2016, make clear he did not change his mind.

weeks after the City revoked all the Project's permits, in which Namvar repeatedly referenced the wrongful cutting of the protected trees as his main point of contention, stating "this is all [Shakib's] doing cutting the wrong tree not mine," and that he had initially let the Water Board issues go because "I figured it will pass, but when I found out that he cut the wrong tree, that was a big issue." Collectively, Namvar's words and conduct clearly demonstrate that, under no uncertain terms, he would not pay the costs demanded by Shakib—not in July 2016 and not ever.

2. *Namvar's July 2016 Refusal To Share Costs Was an Immediate Breach that Triggered the Statute of Limitations*

Relying on *Romano*, Shakib contends even if Namvar repudiated the oral contract in July 2016, the statute of limitations was not triggered because any such repudiation was merely anticipatory (*supra,* 14 Cal.4th at pp. 488-489.) Shakib's reliance is misplaced. *Romano* was a wrongful termination case in which the plaintiff's employer told him he would be terminated at some time in the future. The court held the employer's conduct was a prospective breach, and the statute of limitations on the employee's breach of contract claim did not begin to run until the employee's actual termination, over two years later, during which time he continued to work for the employer and receive his salary. (*Id.* at p. 487.) Namvar's breach, unlike the employer's in *Romano*, was not anticipatory because it was not before the time for performance occurred; Namvar's breach was immediate, unequivocal and concurrent with his July 2016 emails.

16

Shakib argues the time to perform had not arisen in July 2016 because there were not "any facts to show when [Namvar] was called upon to share in, or reimburse, costs incurred pursuant to the Oral Agreement." The context and content of the parties' emails belie Shakib's assertion. While it is true their oral agreement did not include an express time for performance (in part because "unanticipated" costs are by definition temporally and substantively uncertain), "it is a well-established principle of contract law that '[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed.'" (*The McCaffrey Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1351, citing Civ. Code § 1657 ["If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to do done being exactly ascertained"].) ""What constitutes a reasonable time is a question of fact. . . . ,'" which depends on "'the situation of the parties, the nature of the transaction, and the facts of the particular case.'"" (*The McCaffrey Group, Inc.,* at p. 1351.)

At the time of the parties' July 2016 predicament, as evidenced through their undisputed emails, the reasonable time for performance was immediate. The exchange began with an email from Mitchell to Namvar and Shakib informing them counsel for the Water Board "would respond within the next few weeks." Namvar answered, "Nxt [sic] few WKS might b [sic] too late, because our grading permit will expire[.]" Shakib replied, "[Namvar] we need attorney now" and Namvar responded, "Then go get one, this is your doing and you need to fix it."

The parties' exchange shows they recognized an unanticipated cost had arisen: They needed an attorney to rectify their permitting quandary immediately before it was "too late." Namvar immediately refused to contribute, as evidenced by the July and August 2016 emails. As Shakib testified, Namvar abruptly stopped contributing costs and told Shakib, "you cut the trees," and just "walked away." The nature of this real estate development Project demonstrates time was of the essence if permits were at risk—not just immediately but for five years. Namvar's follow-up email a few weeks later suggested the time for performance (i.e., to hire an attorney and begin fixing the permit predicament) had already passed because Namvar demanded information regarding "what steps you are taking to cure these Bad ACTS" and wanted "to make sure you are on top of this to protect our permits and reinstate them." In July 2016, Namvar's refusal to share in the costs that were urgently needed to prevent the Project from being halted indefinitely constituted an immediate, material breach of the oral contract.

Shakib further contends, again quoting *Romano*, that "whether the breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite the breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract." (*Romano*, *supra*, 14 Cal.4th at p. 489.) While Shakib does not flush out the concept of continual contractual obligations or its applicability here, we recognize successive breaches can arise from a single contract with continuing obligations. (See *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1199 [noting the doctrine generally applies to recurring obligations arising under an

18

ongoing duty].) Here, the costs contemplated by the oral contract, if any, were not recurring as they were "not anticipated."

In *Boon Rawd Trading Intern. Co., Ltd. v. Paleewong Trading Co., Inc.* (N.D.Cal. 2010) 688 F.Supp.2d 940, 949, the district court, applying California law, rejected an argument similar to that posed by Shakib and found that the holding in *Romano* should not be used to allow a plaintiff to ignore an actual and immediate breach of an "open-ended" contract with "no specific point in time—or 'time for performance'" because a plaintiff could indefinitely toll the statute of limitations until he or she "elected to treat the breach as terminating the contract . . . ." The *Boon Rawd* court recognized such a rule could allow a plaintiff to wait 50 years to file an action and then collect 50 years of damages: "This is not the law in California, and not the rule contemplated by *Romano*. It would lead to absurd and inequitable results." (*Ibid*.) It is equally untenable here, where Namvar's breach was immediate and complete in July 2016.[6]

---

[6] In Shakib's view, "[t]hus, as a matter of law . . . the statute of limitations did not begin to run until the last [unanticipated] shared expense was incurred . . . ." Nearly from its inception the Project was mired in permitting and other legal challenges. As a result, the timing of the final unanticipated shared expense was unknown then and perhaps is unknown still.

## DISPOSITION

The judgment is affirmed.  Namvar is to recover his costs on appeal.


WISE, J. [*]


We concur:


PERLUSS, P.J.


FEUER, J.

---

[*]      Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.